Call the first case. Case number 10-1537, consolidated with 10-2400. People v. Martiz Hanible. Could the lawyers please approach and introduce yourself to the court. Good morning, Your Honor. My name is Jeff LeCourte. I'm an assistant felon defendant. I represent Martiz Hanible. Good morning, Your Honor. I'm Pete Fisher, assistant state attorney on behalf of the people. I understand you have to reserve some time for rebuttal. Yes, Your Honor. I'd like to reserve three minutes. Okay. Proceed. May it please the court. As I said, my name is Jeff Burkhart. I'm an assistant appellate defender. And I represent Martiz Hanible. Your Honor, as we raise two issues in this case, today I'd like to talk about actual innocence. Of course, if this court has any questions about the ineffective assistance of counsel, I'd be happy to answer those as well. Your Honor, the only evidence tying Martiz Hanible to this offense was the testimony of Brian Keyes. Mr. Keyes completely recanted at a third stage evidentiary hearing. And based on the lack of other evidence tying him to this offense, we ask that this court remand this cause for a new trial. Your Honor, without Keyes' testimony, there never would have been a conviction in this case. There was no confession. There was no physical evidence. And in fact, the only other eyewitness to testify in this case stated that he was certain that Mr. Hanible was not the shooter in this case. So, based on that, when Keyes recanted, he actually brought himself in line with the rest of the evidence at trial. Now, Your Honors, Keyes admits that he made a mistake as a teenager when he identified Mr. Hanible as the shooter. And he was under a lot of pressure at the time. First of all, from himself, to identify the man who shot and killed his friend. But more importantly, he was under a lot of pressure from the police in this case. And in fact, Mr. Keyes was in custody at the time he viewed the lineup in this case. And the police indicated to him that Mr. Hanible was the shooter. Based on that, he made a mistake in identification. Now, Mr. Keyes has grown up. This has been 16 years since this offense. He no longer belongs to a gang. And in fact, he's joined a church that he's very active in. And this case has weighed very heavily on his mind. So much so that Mr. Keyes actually approached Mr. Hanible and asked what he could do in this case. So far, Your Honors, he has drafted an affidavit. Where did he approach him? Your Honor, I don't have the details as far as where he approached him. But my impression is that he contacted him through mail. And then he testified at a third-stage evidentiary hearing. And, Your Honors, he's willing and ready to testify at a new trial.  But he testified at the third-stage hearing. Isn't that right? That's correct, Your Honor. And Judge Kaczmorski listened to him and didn't believe him, right? Well, Your Honor, actually. What's the standard review here? The standard review has got to be manifest way of the evidence, doesn't it? That's correct, Your Honor. So Judge Kaczmorski, a very experienced and learned judge, listened to this and he said, I don't buy it. So what would cause us to say that Judge Kaczmorski's decision is against the manifest way of the evidence? Well, Your Honor, looking at what the court actually stated after this hearing, well, first of all, I want to back up and mention that the State presented a number of witnesses and none of them discredited Mr. Keith at all. But having said that, when you look at what the circuit court actually found, what Judge Kaczmorski found, he never really states exactly what he thinks of Keith's testimony. The only thing he says toward the end is he could be best described as critical and unsure as a whole. And that's kind of an ambiguous phrase. I mean, he certainly is a critical witness. And he is a witness who is certainly unsure of who the shooter is, but he never says that he doesn't find him credible or anything along those lines. Having said that, in addition to this, though. Well, along those lines, aren't you somewhat overstating this recantation then? I mean, you know, this witness didn't get up in front of Judge Kaczmorski and say, this is not the guy. He just said, I'm no longer as sure as I was. Isn't that just impeachment? Well, no, Your Honor. Actually, in this case, he was yes point blank. Your testimony that you gave at trial, do you stand by that? And you said no. The follow-up question was, do you know now who killed Mr. Howard and shot at you? And, again, he said no. So this was an unequivocal recantation. You know, the State in their brief brings it. Didn't he say that he wasn't lying when he testified at trial? Your Honor, that's correct. Then how is that not equivocal? When you look at the testimony, when you look at this at trial, and he states again and again that he doesn't know the shooter, that he never has, and then in cross-examination they ask him, you know, what, did you lie at trial? And you're correct. He says no. When he says that, there are a couple of things. I mean, number one, it's clear from the context this is a man trying to avoid perjury. But in addition to that, if you look at this. Oh, so when are we supposed to believe him? If you're saying he's on the stand now and he's lying. Because he doesn't want to get a chance to prove it. I mean, if he's lying, what part of the testimony are we supposed to believe? Well, Your Honor, again, I don't believe he's lying when he says that he wasn't. It's a little complicated. So was he lying when he said he wasn't lying? No. Your Honor, if you look at this, again, this is a mistaken identification. He was under a lot of pressure from the police. The police told him who to identify in this case. So based on that, he made this mistaken identification. So, you know, when they ask him if he lied, you know, this is implying that he did something malicious. Mr. Hannibal isn't stating that he did this maliciously or that he had it out for Mr. Hannibal. In fact, at the time of the offense, at the time of trial, he didn't even know Mr. Hannibal. This was not a malicious act. This is somebody who was under a lot of pressure both from himself and from the police. The police indicated who he should identify, and he did. It was a mistaken identification. And at this point, he's trying to right the wrong that he caused. But, Your Honors, he had no reason to do this other than to tell the truth at this point. It's been 16 years. You know, and it's important to notice that, you know, this court at this point, according to the Illinois Supreme Court and people of BRTs, this court doesn't have to decide whether Mr. Hannibal is actually innocent. That's not the goal here on appeal. The primary question here is whether there's a reasonable probability that a different outcome would occur upon retrial, and absolutely that's the case here. Upon retrial, not only would you have Mr. Stoller stating that Mr. Hannibal is not the shooter, you would have Mr. Keyes stating that he's not the shooter. Well, I don't really think there would be a retrial. If we sent this back to the circuit court, it would be over. Your Honor, I think the evidence is pretty strong. I mean, you know, this shows that he did not do this. You know, there's a tendency to conflate the term actual innocence and the term proof beyond a reasonable doubt. This is not an actual innocent situation. This is a question where you are trying to show that the State's main eyewitness basically is impeached. I mean, even if he says, I can't make an identification, that doesn't mean that the defendant's innocent. It just means it just lessens the amount of proof that the State has. Well, Your Honor, it lessens all the proof that the State has. Again, bringing it down below the level of proof beyond a reasonable doubt, but that's not the same thing as actual innocence. Well, Your Honor, in the context of saying – And that's what the case is saying. Well, Your Honor, in the case of say something like DNA or something like that, I mean, again – Right. All these things, you know, lessen – I mean, I guess there are different ways to slice it, but all these things lessen the State's ability to prove their case. But, I mean, the question I think that gets to is can a recantation ever serve as the basis for actual innocence? And Mr. Hannibal recognizes that Illinois courts find that recantations are generally viewed with suspicion. He knows that. Okay, so let's add that to the formula. You have a third stage evidentiary hearing in which the standard of review is was the judge's decision against the manifest way of the evidence and throw in the fact that this is all about a recantation, which are disfavored in the law. Where are we going? Well, Your Honor, as far as the recantation, though, I mean, if there's any case that's going to serve as a – where a recantation can serve as a basis for actual innocence, this is the case. What other case do you have where the only evidence tying the person to the offense is a person who's recanted? You know, and there's a good reason for courts to be reluctant to remand on these basics. You know, if you have three or four witnesses who identify the same defendant, one of them recants, there's a good reason for the court to be suspicious. There's a good reason for the court to be reluctant to remand. But that's not this case. This case, we have one person who identified him. We have one person who said it's definitely not him. The one person that identified him is now recanted. And he has a very plausible story. You know, this isn't somebody who was friends with the defendant and he just flipped. This isn't somebody where – I mean, there's no reason 16 years later to come forward unless he's trying to tell the truth, unless he's trying to right the wrong that he did. So at this point, certainly, I mean, recantations, there is a good reason that they're viewed with suspicion. But, again, if there's ever a case where it could serve as a basis for actual innocence, this is that case. You know, if there's ever a case where this court should remand, this is that case. You know, again, very plausible story here. He wasn't discredited by the state's witnesses. He has no reason to come forward now other than to tell the truth. And this deserves to go in front of a jury to determine what would happen or, as he stated, if this was plead out or whatever occurred. I can't predict that. But, in any case, it's enough that this should go back to the trial court. Let me ask you this. In the PC petition, did the defendant ever file an affidavit that he was actually innocent? Your Honor, I don't believe that he filed an affidavit stating that he was actually innocent. He did claim in his post-conviction petition that he was raising actual innocence. He did raise this. Oh, he's raising actual innocence. But did he ever say, I am actually innocent? He did claim that in the post-conviction petition. As far as whether or not there was an affidavit, I don't believe there was an affidavit in which he swore that. But he did raise that in the post-conviction petition. Your Honor, as briefly, unless there are any other questions about actual innocence, I wanted to address ineffectiveness just briefly. Again, this did not reach the third stage. This was actually the second stage of dismissal. And counsel agreed to an inaccurate jury instruction. This was IPI 3.15. You know, because the time is getting close, I think it would be a good idea to cover that on your rebuttal. Let's hear from the State about that. Certainly. Thank you, Your Honor. Good morning, and may it please the Court. How about starting off with the question of the ineffective assistance? Well, on the ineffective assistance, there were three claims that were raised in the PC petition. They were dismissed at the second stage. The defendant had a lawyer. And that dismissal was proper where there was no substantial constitutional issue. The three issues were the IPI 3.15, and this Court has previously held in the Chapman case that that's not the kind of case, thing that can be, it was a new rule. And it's not the kind of thing that can be raised collaterally in the guise of ineffective assistance of counsel. Counsel can't be faulted for failing to know that 3.15 was going to be held to be an improper instruction. In addition, in this case, if there were an error in not giving it, the parties clearly argued, especially the prosecutor in rebuttal, clearly argued the factors in 3.15. So the jury was fully aware of the factors that were relevant. The second issue in the ineffective assistance of counsel claim was a claim that trial counsel was ineffective for failing to call the defendant's prior attorney by the name of Del Valle to testify as to the circumstances of a defendant leaving the state of Illinois, whether or not that attorney gave the defendant some advice. You should get out of town because... Well, isn't that what happened here? Didn't he give him advice to get out of town? There is an affidavit in the record that says that he gave that advice. It's crucial to note here, though, that this attorney, the trial attorney, Mr. Buchholz, who was an experienced public defender, has been around for a long time. He was fully aware of Mr. Del Valle's potential testimony. He spoke with Mr. Del Valle. Mr. Del Valle apparently was there at trial, and Mr. Buchholz chose not to call him. And under Strickland, those choices about whether or not to call a particular witness are entitled to great deference. And it's not a case where the attorney was unaware of some potential evidence or didn't know anything. He made an affirmative choice after discussing it with Mr. Del Valle not to call him. So I believe that's actually... Well, it had... I'm sorry to interrupt you. It had been brought into evidence in the state's case, had it not that the defendant was ultimately apprehended in Wisconsin? Milwaukee. And was in Milwaukee. And so at least lurking somewhere in the case, Mr. Buchholz had to know, was the idea that the defendant was outside the jurisdiction. And I understand the state's position would be that calling Kent Del Valle is a strategic choice, but I'm going to ask you the tough question. Why in the world wouldn't you call him? Well, there was an intimation in the record at one point that the defense might be relying on a notion the defendant was actually leaving because there was a pending drug case against him as well. And that was a potential other avenue. You know, the problem with calling a defense attorney is that you might have to... Well, of course you would definitely have to waive the attorney-client privilege. And we don't know, but it's possible the defendant said more than, the police are looking for me. There may have been some communications that they could have gotten into that would have been more damaging to the defendant's case than just the, I gave him some advice to leave town. The other thing to remember, this court has already decided in its initial opinion this wasn't a closely balanced case. The court discussed one of the issues on direct appeal was whether or not some comments made about the co-felon, the other shooter fleeing, whether those were material. And the court found that they weren't. This also would not have... There was no prejudice here, even if you get past the first prong of Strickland. There's certainly no prejudice in not calling Mr. Duvalier. The third issue was a claim that... So now the attorney-client privilege is gone. So if Judge Kazmersky granted a third-stage hearing, then Kent Duvalier has got to get on the witness stand and talk about this conversation. And I assume that since the privilege is now gone, he'd be open to cross-examination as to the entire conversation. And any other somewhat prejudicial reason the defendant may have come up with as to why he had to get out of town. And it seems to me that that might be an interesting cross-examination. Well, that's what I'm suggesting, Your Honor. I mean, you know, for all we know, the defendant said, I did it, I got to get out of town. Yeah, but I'm going to ask you to, well, I'm not going to ask you to look into their minds, but they know they're opening that door by filing Duvalier's affidavit. So, I mean, I'm wondering if they're willing to take that risk. I guess the question is, if they're willing to take that risk, why not let them have their day in court? Well, they may or may not. They've got an affidavit on one point. They may have discussed it with him or they may not have discussed it with him. We don't know what else they might have discussed with him. But be that as it may, they still can't satisfy the prejudice problem. And the judge is entitled to dismiss a claim of ineffective assistance counsel on either prompt. And they have to make a substantial showing that defeats both prompts. And I don't think they've done that. The third issue is a claim that the trial counsel was ineffective for agreeing to a stipulation that they now say was factually false. The stipulation was that there's nothing in the detective's report saying that he talked to this Stallworth witness and that the Stallworth witness said the shooter wasn't there in terms of the lineup. And it's kind of a technical point, and there may be some semantics involved, but we have to remember that Stallworth first told the police, although he denied it, he first told the police that I didn't get a good look, I don't think I can identify anybody. I'm not sure I can identify anybody. So then if he goes to the lineup and he says I can't identify anybody, that would be consistent with that. But what he's trying to claim at trial is all along did get a good look, and so that the statement the shooter isn't there is a realization or a claim by him that he could identify the shooter had the shooter been there versus a blank statement of I don't identify anybody. So it's a much more positive statement on behalf of Stallworth, and therefore there is a difference. So it's not a false statement that was introduced. And so trial counsel can't be faulted for agreeing or stipulating something that is in fact in the police reports or the detective would have testified that I never had this conversation where he made a positive statement, the shooter isn't there because that statement denotes that he actually knew who the shooter was or could identify the shooter. And of course that was our position all along that he couldn't identify the shooter. Turning again to the first issue, the so-called actual innocence issue, this is not really a recantation. What Mr. Keyes did when he came back and gave his testimony at the evidentiary hearing was kind of uncertain mush. We have to remember again this court found the evidence to be essentially not closely balanced, found it to be credible. When he testified at the first trial he stated he had a good look, the streetlights were on at the corner, men stopped seven feet from him, he looked him right in the face, identified defendant as the man in the middle of the group, defendant wore dark pants, a white shirt, described the haircut. And then it's interesting because at trial the people put on Detective Mohan who went to the scene of the murder and said that Brian Keyes told him he could make an identification. Brian Keyes when he gets on the stand at the evidentiary hearing makes several claims that were out and out not true. He basically would have had the court believe that he all along told the police and anybody else who would listen that he was unsure. He was specifically asked did you tell that to the state's attorneys? And it's unclear whether the question was relating to the state's attorneys at trial or the state's attorneys at the grand jury. So in the evidentiary hearing we put both on, we put the trial assistants on, we put the grand jury assistant on, and they said no he never said anything like that, he never said he was unsure, he never said the police told him who to pick out, he never said he was drunk. Detective Mohan testified at trial that he never said he was unsure. So the notion that he was unimpeached is just flat out wrong. Wasn't he a drug addict? He had taken drugs, I don't know if he was necessarily a drug addict, but he had taken drugs, he had been drinking. Do you know people who take drugs who are not drug addicts? I suppose you could make that claim, yeah. I mean, I don't know if he's addicted to it versus. You don't have to answer that, you know, in person. I don't think that's fair. Yeah, thank you. And there is a Fifth Amendment, so. Yeah, I appreciate that. In any event, he claimed at the hearing that he had been telling people this all along. It's interesting because if you look at his affidavits, his story changed from his first affidavit to his second affidavit to what he said at the evidentiary hearing, which of course was different than what he said at trial. In his first affidavit he just says I had continual doubt, I've had doubt as well both times, irrespective of my doubt I identified defendant. I'm almost for sure he didn't do it. It's a 50-50 chance he wasn't one of the guys. He's still not come out and said this isn't the guy. The best that he comes out and says I'm not sure. So then he files a second affidavit and now the police are telling him who did it and showing him photographs. Of course, when he gets to the evidentiary hearing, it's more of like telepathy or gestures or something. The police are somehow communicating, not telling him who to pick out, but they're gesturing in a certain fashion about who to pick out. And the bottom line is this judge was fully aware that he was making a credibility determination. That's the whole point of having an evidentiary hearing is so the judge can make a credibility determination. He said several times before the hearing that he wanted to hear these witnesses because he needed to make a credibility determination. When he's making his findings, he starts out by saying I have to make credibility determinations. And then when he rejects the petition as a whole, he says that this witness' testimony was unsure as a whole. And it can't be unsure. It has to be convincing. It has to be convincing and taken as a whole, this court has to determine that the judge's findings, that it wasn't convincing, that it was unsure, and that they had not made out their burden, was manifestly erroneous. And I would assert that under these circumstances, certainly what the judge did was in line with what the record showed and was not manifestly erroneous. Do you know what would motivate somebody like this to come in and lie at this point in time? I don't know who his friends have become in the interim. He's been in and out of jail. There was evidence in the record that there's a man who had filed an affidavit with statements that the defendant, that Brian had discussed the case with him and possibly with the defendant's mother. And there was some talk back and forth about when he contacted the public defender and who he contacted. I don't know if he's made friends with this man over the course of time or not. I mean, there's all sorts of reasons why someone's testimony might change. He's claiming that he's had a conversion experience or something along those lines. I would assert it's much more likely that he's made some friends that are friends of the defendant and he's decided to change his tune. But it is significant that it's not a full recantation. He still doesn't say, this isn't the guy. He just says, I don't know. So this really isn't actual innocence. This is impeachment. This is relating to reasonable doubt, and therefore it's not the proper subject of an actual innocence petition. In terms of the trial court's ultimate credibility determinations, how do you think the Michael Collins affidavit and ultimate recantation of his recantation figures in? He just seemed to reject that out of hand once he heard the evidence that Collins had said that the whole thing was a lie. I don't think that played anything to do with assessing the credibility of Hannibal of Keyes himself. I think those are two separate things. I think he was going through a list of things that had come before him in the hearing. And at one point he had expected, I think, to hear from Collins. And I think there's a reason that he didn't hear from Collins is because Collins recanted his statements. Collins, of course, we know, pled guilty to this case and then withdrew himself from that. Thank you. Your Honor, just briefly, turning to ineffective assistance of counsel, the Rule 3.15, counsel mentioned that this took place before Gonzalez and the other cases that deal with that pattern of jury instruction. While that's true, actually, the appeal in this case took place in 2001, the exact same year that Gonzalez came out. So we know that appellate attorneys were raising these issues at the time. More importantly, if you look at U.S. Supreme Court's decision in 1987- But until some court adopts this rule, I mean, let's face it, thousands and thousands of cases were prosecuted where that instruction was used with all the little ors in it. And until some reviewing court says, cut that out, how can you say that it's ineffective assistance of counsel not to raise it? Well, again, I mean, this is something that people were already raising at the time. But the law in 1997, well before the appeal occurred in this case, was that you have to use all five factors. I mean, that was in the U.S. Supreme Court's decision in Manson v. Braithwaite. So this was going on prior to that. You're correct. It wasn't until Gonzalez and then Heron-Pietkowski that the Illinois Supreme Court or, sorry, the Illinois Appellate Court and the Illinois Supreme Court had ruled on this. I think it was our friend Justice Grimey who used the word that we would have to ascribe, I think it was a certain amount of prescience to counsel in order to hit them with ineffective assistance of counsel. Well, Your Honor, I think based on the law that was already established that, you know, that you have to discuss each of these five factors, I think that was basis enough. I mean, it was, and Gonzalez defined that. So it would have been in this case as well. But turning to the second issue in terms of flight, you know, the pretrial, if you look at the record in this case, they discussed flight in a motion to eliminate. And everyone agreed that flight was off the table or wasn't going to come in. And then the state brings it in at trial. The state, at closing argument, and actually it takes up about four pages of transcript, argues that he fled the jurisdiction. Attorney DelValle was in town. He was ready and willing to testify. As far as waiving the attorney-client privilege, you know, there's no case law that I'm aware of that says that once you waive this corner of the attorney-client privilege that you're an open book and that you can be questioned about anything within the attorney-client privilege. He was willing to testify as to his advice regarding flight. And this is Mr. Hannibal's to waive. You know, it's not anybody else's. And he's willing and ready to waive things. He has the right. I mean, certainly the state would have the right to cross-examine him as to that entire statement. Not just what he said, leave town, but everything that was said during that conversation. I think everything that comes kind of under this umbrella of flight and leave in town. No, everything that was in that conversation. If there was a conversation and in that conversation there's a discussion about flight, everything else in that conversation, I believe the law comes out. Don't you think that the defense lawyer who was aware of what Del Valle said as a strategic decision would think everything else comes out that happened in that conversation? Well, Your Honor, there are a couple pieces to it. I mean, clearly Hannibal, despite whatever risks that carries, is still willing to go forward with this. Well, that's because he's been convicted now. Well, but in addition to that, Your Honor, I mean, Attorney Del Valle was willing to testify to this, another attorney. So this is somebody who had served as his attorney previously, and he was willing to bring this out. But in terms of trial strategy, though, this is not something that the court should have considered at second stage. That's something that should have waited until third stage. You know, that's factual determinations, credibility determinations, trial strategy are things that should be reserved for an evidentiary hearing, and here it wasn't. The state relies on the fact that it's clear, at least, that Mr. Buchholz was well aware of Mr. Del Valle and what Mr. Del Valle had to say about this go-to-Wisconsin conversation. That's correct. And so this is a decision that was made as opposed to just a lazy failure. It's a decision that was made. Doesn't the law say that we have to respect that decision? Well, to the extent that it was a decision that he made, again, that's going to trial strategy, something that the court really should have considered. And we're not really in a position, are we? I believe that we should say that that was a bad decision. Aren't we supposed to respect trial counsel's strategic decisions? As long as he's aware of it and has talked to Del Valle, I mean, and then he makes a conscious decision not to call him, aren't we supposed to respect that? Well, Your Honor, if it was a conscious decision, and he definitely knew, you're correct, I mean, he knew about Attorney Del Valle. And if it was a conscious decision, again, this goes back to trial strategy, and that's not something this Court isn't in a position to say, the trial court shouldn't have made this decision at the second stage. It shouldn't have dismissed just yet. So your position is you're right, Judge, but we should respect trial counsel's decision-making process as long as we know what it is. And you're saying, well, why shouldn't we have had this hearing and have Mr. Buchholz tell us what he did? I mean, the position of Mr. Hannibal, I mean, is that we just don't know that this was trial strategy. We just don't know because we don't have that testimony. He definitely, I mean, you're correct about him knowing about Del Valle, but beyond that, we have no idea. And we won't until an evidentiary hearing occurs. So based on that, we're asking that this go, again, unlike the actual instance, this was second stage, so we're asking this to go back for third stage proceedings. There really wasn't any reason to not call Del Valle. You know, this attorney was ready and willing to testify. Well, I guess we don't really know. I could think of some. I guess we really don't know. You don't think you could think of some? I'm sorry, Your Honor? I mean, as a defense lawyer, I cannot imagine a defense lawyer getting on the stand and saying, I told my client to flee. Well, again, the circumstances here weren't quite about flight, though. Well, leave town because the police want to talk to you. Well, at this point, Your Honor, the police had talked to him. They had him in a lineup, and Mr. Stallworth wasn't able to identify him. They couldn't find Mr. Keyes to even view the lineup. I understand the fact. I'm just saying, as a defense, if I were a defense lawyer, thinking about putting on another lawyer to say the client that I'm trying to defend for murder, the lawyer told him to leave town for whatever reason. And here, I mean, the reason was police harassment and things along those lines. But answering your question, though, I think, again, that goes back to trial strategy, and it's something we just simply don't know. And we can't know until we get to a third stage evidence you're hearing, which is what we're asking. But I think the point, or at least one of the points that Justice Lampkin is trying to make is that it's almost, it's hard to conceive. It almost screams. I'm sorry? I said it almost screams. Yeah, I mean, it's hard to conceive. I told the client to flee. Because it's like Kete de Valle would be handing the state their closing argument. It's like, here, why don't you also talk about flight? You know, because I told my client to leave to Wisconsin. You know, Your Honor, again, the state did bring in flight already, and they were arguing about this. Well, I'm just saying that when de Valle is supposedly sitting down with your client and advising him, you know, it's like saying, well, I'll tell you what, let's give the state, in case they ever charge you, let's give the state another argument, and that is flight. Well, on the other hand. Well, I don't know that Attorney Del Valle could have foreseen that this would have gone to trial at this point, because nobody identified this guy at that point. There was no warrant. You know, they never told him he had to stay in town. And it wasn't like he fled to Mexico or went to Florida. I mean, he was an hour and a half away staying with family. So, you know, this wasn't a huge leap like he was making this flight from this murder case. There was nothing pending. I mean, he hadn't been charged. The state made it sound like a huge leap, didn't they? Well, the state did make it sound like a huge leap, right. And, again, I mean, they really emphasized this in closing argument for about four pages of transcript. And they could have added to it, and his lawyer told him to leave before he got charged. Well, and maybe that's true. But, you know, again, there are different ways that defense counsel, you know, Attorney Buckles could have attacked that in closing argument, saying that, look, this guy wasn't fleeing. I mean, because the point behind the state showing flight was to show consciousness of guilt. If you have an attorney saying, look, there are no charges pending, go stay with your family. You're experiencing police harassment, go an hour and a half away. That's fine. I'll contact you. You know, that's a different story. That's not consciousness of guilt. And that's what Attorney Delphi was ready to testify to. So, again, we don't know the details of this until this gets to an evidentiary hearing, which is what we're asking for. So, Your Honors, unless there are any further questions, again, we ask that on the actual innocence claim this court remand for a new trial. Based on the ineffective assistance of counsel, we ask that this court remand this for third stage evidentiary hearings. Thank you. We thank you guys for giving us a very interesting case. We'll take it under advisement.